# EXHIBIT C

Case 6:25-cv-01401-RBD-RMN Document 1-3 Filed 12/18/25 Page 1 of 80 PageID 389

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Orlando Division**

| | |
|---|---|
| ABACUS GLOBAL MANAGEMENT, INC., a corporation,<br><br>Plaintiff,<br><br>v.<br><br>COVENTRY FIRST LLC, a limited liability company; ALAN BUERGER, an individual,<br><br>Defendants. | Case No.: 6:25-cv-01401-RBD-RMN<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Abacus Global Management, Inc. ("Abacus" or the "Company"), by and through its undersigned counsel, brings this First Amended Complaint against Coventry First LLC ("Coventry") and its co-founder and Executive Chairman Alan Buerger ("Buerger") (collectively, "Defendants") and pleads as follows:

## NATURE OF THE ACTION

1. Founded two decades ago, Abacus entered the life settlements business with a distinctive business model predicated on transparency and fair pricing. Unlike its competitors who operate through opaque valuation processes, Abacus built its reputation—and its status as the industry's only

publicly traded company—by providing policyholders with unprecedented access to policy valuations through its proprietary Life Settlement Calculator. This tool enables policyholders to understand the net present value ("NPV") of their policies, fundamentally altering the traditional information asymmetry that has long characterized this market. The result is that Abacus consistently pays higher prices as a percentage of each policy's face value than its competitors—a premium that reflects both its commitment to transparency and the competitive advantage such transparency creates.

2. This approach has proven commercially successful: After steadily growing for years, the Company's quarterly revenues have quadrupled since 2023. Today, Abacus acquires over 25% of all life insurance policies sold in first-time life settlement transactions, and its market share continues to increase.

3. Coventry is a direct competitor of Abacus in the life settlements space. Rather than embracing transparency as Abacus has done, Coventry has gone on a very different journey over the last twenty years. Coventry's pattern of misconduct is extensive and well-documented. Coventry faced bid-rigging charges from the Office of the New York Attorney General, and it settled a multi-billion-dollar fraud case brought by insurance giant AIG. A federal Court of Appeals characterized Coventry's policy origination practices

as “***illegal***.” Unlike Abacus, Coventry operates without pricing transparency, concealing its valuation methodology from policyholders while simultaneously representing to investors that it achieves profit margins of 40–60% or more on individual policies—a spread made possible only by systematically undervaluing policyholder assets. Coventry can afford to operate this way because it is not a publicly traded company like Abacus, and thus faces less regulatory scrutiny and fewer disclosure obligations. And despite generating profits by acquiring policies substantially below what Abacus deems to be a fair representation of NPV, Coventry is losing market share to Abacus every year.

4. Unable to match Abacus’s transparent pricing model or market performance, Coventry’s co-founder and Chairman, Alan Buerger devised a scheme to undermine Abacus through false and misleading statements: convince the market that Abacus pays policyholders ***too much*** for their policies—and that this alleged “overvaluation” (which amounts to paying a policyholder too large of a lump sum payment for their life insurance policies) is fraudulently reflected in Abacus’s ***audited*** financial statements, thus artificially inflating the Company’s stock price. In other words, according to Coventry, the very business model that Abacus uses to deliver greater value and higher monetary payments to policyholders is actually a massive fraud against its shareholders—a baseless and defamatory narrative.

5. In spreading these falsehoods, Coventry deliberately ignores Abacus's consistent and legally mandated disclosures that policies on its balance sheet are valued "under the fair value method"—that is, market price, which is fundamentally distinct from the NPV used in the Life Settlement Calculator for policyholder transactions. The statements by Coventry and Buerger, also ignore fundamental realities of the life settlements business and are designed to confuse the investing public.

6. Since the beginning of 2024, Coventry and Buerger have routinely disseminated false and misleading statements about Abacus, in particular targeting Abacus's relationship with Lapetus Solutions, Inc. ("Lapetus"), a third-party life expectancy estimate provider that recently dissolved because of Defendants' conduct. Defendants' core claim is that Lapetus life expectancies are too short, and that Abacus relies on those estimates to intentionally overvalue the policies it buys and sells.

7. This is false, misleading, and defamatory for several reasons, including that:

a. Lapetus life expectancies are not less accurate than the estimates of any other life expectancy provider;

b. Abacus considers life expectancy estimates from at least half a dozen providers, and thus does not solely or even primarily rely on Lapetus life expectancies;

c. Abacus does not use a life-expectancy-based methodology to value the policies on its balance sheet; it instead uses a market-based valuation approach;

d. Abacus's market-based valuation methodology consistently values the policies on its book within Abacus's stated margin of error of 2%; and

e. Neither Coventry nor Buerger have explained why, if they consider Lapetus estimates to be incorrect, ***Coventry has purchased Lapetus life expectancies <u>over 4,000 times</u>***, both before ***and after*** Lapetus rebuffed Buerger's attempts to interfere with Lapetus's life expectancy methodology.

8. Coventry, and in particular Buerger, have intentionally made false and misleading statements about Abacus and its use of Lapetus. They did this through self-proclaimed independent but paid studies that purport to show that Lapetus underestimates life expectancy, causing Abacus to overpay policyholders, and then overvalue the policies on its book. From May 2024 to June 2025, Defendants spread these false claims across a wide range of audiences, each deliberately chosen to inflict maximum harm on Abacus. Coventry presented its lies to Abacus's auditor, Grant Thornton; market analysts that track Abacus's stock, such as TD Securities; and government agencies, including the Securities and Exchange Commission ("SEC").

Coventry then filed and voluntarily dismissed a meritless lawsuit, for which it had no standing, against the Florida Office of Insurance Regulation (“OIR”), seeking Lapetus’s audit records. Coventry’s OIR filing included even more false and malicious claims, including that Abacus “is a publicly traded company whose shareholders’ investments are dependent” upon Lapetus life expectancy estimates.

9. Despite Defendants’ defamatory campaign, Abacus’s financial performance has continued to demonstrate the falsity of Defendants’ claims. In the first quarter of 2025, Abacus reported a 105% increase in year-over-year revenue; a 111% increase in year-over-year adjusted EBITDA; and a 158% increase in adjusted year-over-year net income. This explosive growth is inconsistent with Defendants’ implication that Abacus is ***overpaying*** for its core assets in economically inefficient transactions—because Defendants’ claim is false.

10. Defendants needed to do more to stop Abacus’s forward momentum. So Buerger—giving an interview in his capacity as Coventry’s chairman and founder—took these insinuations to the next level in a May 22, 2025 interview with Tegus, Inc., a financial expert network (the “Tegus Interview”). In a barely five-page transcript, Buerger accused Abacus of “manufactur[ing] earnings,” said that its “stockholders . . . will be subordinated to the asset-backed debt, which is to say they will all be wiped

out when this thing goes upside down," repeated that Abacus was "us[ing] Lapetus . . . primarily," and predicted, "it's just a matter of time before [Abacus] implode[s]."

11. Buerger claimed to speak with authority about Abacus, calling the Company his "***pet project***." An authority Buerger apparently also developed by attending all or virtually all of Abacus's earning calls since 2023, including on August 7, 2025, weeks after Abacus filed its initial complaint. Claiming to "know every public document" Abacus has filed, Buerger apparently ignored that Abacus clearly and repeatedly disclosed: (i) Abacus's financial statements and internal controls over its financial reporting have been found in compliance with Generally Accepted Accounting Principles ("GAAP") by a respected public company auditor, Grant Thornton, in every annual audit since the Company's inception; (ii) Abacus has zero "asset-backed debt"; and (iii) Abacus has ***never said that it uses Lapetus to value the assets on its balance sheet, nor has it ever done so***.

12. These false statements were made with full knowledge of their inaccuracy in light of Buerger's claim that he has read each and every one of Abacus's SEC filings. On June 4, 2025—the same morning that Buerger's Tegus Interview was published and/or circulated to Tegus subscribers, including some of Abacus's largest stockholders—the other shoe dropped.

13. For over a year, Defendants have been soliciting multiple short sellers to write a hit piece on Abacus, regurgitating the same false claims about Lapetus and Abacus's pricing practices and valuation methodology. At least one prominent short seller turned them down because the narrative that senior citizens are making ***too much money*** from selling their insurance policies is not a compelling story. But, eventually, short seller Morpheus Research L.L.C. ("Morpheus") agreed to participate in Defendants' smear campaign. The same morning the Tegus Interview with Buerger was released to investors, Morpheus released a report (the "Short Report") citing Coventry's "research" on Lapetus and quoting some of Defendants' most inflammatory accusations, under the title: "Abacus Global Management: This $740 Million SPAC Is Yet Another Life Settlements Accounting Scheme Manufacturing Fake Revenue By Systematically Underestimating When People Will Die." Within minutes, Abacus stock (NASDAQ: ABL) dropped over 21%, erasing more than $157 million in market capitalization in a single day, and roughly $287,400,000 over the next four weeks.

14. Defendants' relentless campaign against Abacus has caused substantial harm to the Company and its stockholders. Defendants' false narrative attempts to project Coventry's own financial vulnerabilities onto Abacus, but the facts demonstrate otherwise. The market analysts who came to Abacus's defense after the Short Report recognize the truth: Abacus's

transparent approach is a ray of sunshine in an otherwise beleaguered industry, and that explains its rapid rise.

15. Yet many Abacus investors have raised concerns in the wake of the Tegus Interview and the Short Report that parrot the same false statements Defendants have been making for over a year. Critically, these investors have focused on the parts of the Short Report that simply repeat Defendants' prior defamatory remarks, such as that "[Abacus's] fair market value is grossly overstated" and that "[f]unds and companies like Abacus that rely on Lapetus . . . could soon face growing challenges with serious consequences for investors."

16. In fact, ***Buerger is communicating directly with Abacus investors and disseminating Coventry's misleading "studies" of Lapetus***. Of course, Buerger's communications omit that Lapetus has thoroughly rebutted Coventry's one-sided studies with its own independent report, which has caused market analysts to conclude that "there is no evidence that [Lapetus] under-estimates [life expectancy]."

17. To be clear, this case is not about legitimate competitive practices or good faith criticism of a competitor's business model. Competition through superior products, services, or pricing benefits consumers and strengthens markets. Defendants' conduct, however, crosses the line from lawful competition into tortious interference and defamation. Rather than

competing on the merits by offering policyholders better terms or more transparent pricing, Defendants have chosen to attack Abacus through a systematic campaign of false and misleading statements designed to damage Abacus's reputation, confuse its customers, and undermine investor confidence. This calculated campaign to harm a competitor through deception and falsehoods rather than through a legitimate business strategy has no place in a properly functioning marketplace.

18. Abacus therefore brings this action to put an end to Defendants' unjust and anticompetitive scheme of spreading false and misleading statements about Abacus's business, and to restore its reputation. Abacus seeks compensation for the substantial economic and reputational harm Defendants' falsehoods have caused.

## PARTIES AND JURISDICTION

19. Abacus is a corporation organized under the laws of the state of Delaware with its principal place of business in Orlando, Florida.

20. Coventry is a limited liability company organized under the laws of Delaware, with its principal place of business in Fort Washington, Pennsylvania. ECF No. 1 (Defendants' Notice of Removal) ¶ 20. According to Coventry, it has one member—Dash Investments LLC ("Dash")—which has its principal place of business in Fort Washington, Pennsylvania. *Id.* ¶ 22. Dash in turn has two members—the Buerger 2003 Family Trust and Alan H.

Buerger 2003 Trust for Reid S. Buerger—that Coventry contends are citizens of Pennsylvania. *Id.* ¶¶ 23–24. In short, Coventry contends it is a citizen of Pennsylvania. *Id.* ¶ 31. Coventry is also registered and licensed to do business in Florida.

21. Alan Buerger, the co-founder and Executive Chairman of Coventry, is a citizen of the state of Pennsylvania.

22. The Court has subject matter jurisdiction over this case pursuant to Section 1332(a)(3) of Title 28 of the U.S. Code because the suit is between citizens of different States and the amount in controversy is in excess of $75,000, exclusive of interest, costs, and attorneys' fees.

23. This Court has personal jurisdiction over Defendants, pursuant to Federal Rule of Civil Procedure 4(k)(1)(A). Defendants engage in substantial and not isolated activity within the state of Florida. This Court also has personal jurisdiction over Defendants because the causes of action in this Amended Complaint arising from Defendants acts were committed within this state and caused injury to a citizen of this state.

24. Venue is proper in the Middle District of Florida, Orlando Division, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this District, and Abacus has suffered significant reputational and economic harm within this District as a direct result of Defendants' conduct.

## FACTUAL BACKGROUND

### I. ABACUS AND COVENTRY COMPETE IN A GROWING MARKET.

#### A. A New Asset Class For An Uncertain Time

25. While life insurance often provides the policyholder and their family with peace of mind, in most cases it fails to deliver a financial benefit.

26. Of the approximately $13 trillion in potential benefits currently underwritten in the United States, insurance industry forecasts predict that over 90% will never pay out, due to the policyholder's inability to pay the premiums necessary to keep the policy in force.

27. As a result, many policyholders end up wasting the value built up in their policies, even though life insurance is considered valuable and transferable personal property. *See Grigsby v. Russell*, 222 U.S. 149 (1911).

28. The life settlements industry helps solve this problem by allowing policyholders the opportunity to monetize their policies. A "life settlement" transaction allows the original policyholder to sell their life insurance policy to a licensed third party at the policy's then-NPV, where NPV equals the face value of the policy upon maturity and any future premium payments discounted to the present, with the total forecasted discounting period being based on the policyholder's life expectancy at the time of the settlement.

29. In a typical life settlement transaction, the original policyholder receives a lump-sum cash payment, which can be quite meaningful because life insurance is often a senior citizen's largest asset (including their home). On average, life settlements companies pay sellers nearly eight times more than the current cash surrender value the seller could get from their insurance carrier. Sellers are freed from paying premiums, and are able to use the proceeds to support their retirement, transfer wealth, and pay medical bills.

30. In exchange, the purchaser in a life settlement transaction receives the right to collect the face value of the policy at maturity, provided that the purchaser maintains the premiums as required under the original insurance contract.

31. For the same reasons that life insurance offers peace of mind to the original policyholder, life settlements are a very stable investment. The payouts under life insurance policies are cash reserved by highly-rated insurance companies and not correlated to market trends.

32. Abacus estimates that the scale of the life settlements market opportunity is $233 billion each year, yet only 2% of those policies are captured in life settlement transactions, which means this market offers significant growth opportunities.

### B. The Life Settlements Value Proposition

33. After the initial issuance of a life insurance policy, life insurance policies are sometimes bought and sold in two distinct markets. Transactions in which the policy passes from the policyholder to a licensed life settlements provider occur in what is known as the "secondary market." Transactions in which the policy passes from one investor (including the life settlements providers like Abacus and Coventry) to another investor interested in this new alternative investment opportunity occur in the "tertiary market."

34. As life settlements providers, Abacus and Coventry can operate in both markets, and realize their profits by optimizing policy value in between the purchase from the policyholder and the sale to the investor.

35. Neither Abacus nor Coventry are insurance providers.

#### 1. The Secondary Market and the Role of Life Expectancy Estimates

36. The price paid in a secondary transaction takes into account the value of the policy to the original policyholder, meaning that it assumes the only alternatives to selling the policy are making premium payments to keep the policy in force, or allowing the policy to lapse—which would result in a loss of the death benefit.

37. Defendants, having operated in the secondary market for life settlements for over four decades, know that the NPV of a particular policy

Case 6:25-mc-00004-RBD-RMN Document 3 Filed 12/18/25 Page 15 of 80 PageID 113

generally depends on the characteristics of the policy—such as the amount of remaining premiums to be paid and the face value of the policy—as much as, if not more, than the policyholder's life expectancy, ("LE" or collectively, "LEs"). While buyers in the secondary market look to LEs (both from third-party providers and the buyers' own internal estimates) as one data point when pricing a transaction, the potential to generate positive cash flows from a life settlement transaction depends on, among other things:

a. The age of the insured (irrespective of life expectancy or present health conditions);
b. The carrier underwriting the policy;
c. The annual premiums relative to the size of the death benefit;
d. Risk of loss, which includes (i) the probability that the owner of the policy will have to pay more in premiums than the face value of the death benefit before the insured passes away; and (ii) the probability that the insured will outlive the coverage of the policy;
e. The desired internal rate of return of the potential investment in the underlying life insurance policy; and
f. The purchaser's cost of capital.

38. LEs (whether generated by a third-party or an internal analysis) do not dictate those variables, or the relative weight that potential buyers and sellers will give to each of them. Some of the relevant pricing factors are immutable, like the insured person's age; other pricing factors are creatures of contract and may be reduced, like the monthly premiums.

39. When a life settlements provider like Abacus considers whether to buy a policy, and how much to pay, it considers the totality of these factors, not just LEs. For example, Abacus realizes significant value from optimizing the premium payment schedule of its policies. Therefore, the relative length of the insured's life, whether estimated too short, too long, or just right, is not dispositive of any decision to purchase a policy, or the price paid.

40. Companies like Abacus and Coventry use an array of LE providers in addition to their internal estimates: they buy policies that have more than one LE from different providers; they also buy policies without the aid of any LE.

41. In at least a quarter of its secondary market purchases, Abacus has zero control over what LE is used, because those policies are immediately sold to an investor, with that investor dictating which LE (if any) will be used to price the deal.

42. It is even common in secondary market transactions for a life settlements provider like Abacus or Coventry to obtain an LE, disagree with

the result, and ignore it based on their own internal analysis. That is because it is well-known in the industry that certain LE providers have different strengths (*e.g.*, when assessing a particular health condition, or when assessing a relatively young insured's life).

43. Therefore, while a difference in estimated life expectancy is of the utmost importance to an insured person and their loved ones, neither the identity of the LE provider, nor the methodology that particular provider uses, dictates the price that Abacus or any other buyer will ultimately pay for that individual's insurance policy.

44. Coventry and Buerger are well aware of these dynamics in the secondary market, because they frequently compete with Abacus for the rights to particular policies.

### 2. The Tertiary Market

45. Tertiary sales of policies—*e.g.*, from one investment fund to another investment fund—operate like sales of other fixed-income assets that trade over-the-counter, such as mortgages or collateralized loan obligations. The buyers in the tertiary market are not licensed intermediaries and do not interact with the insured. The buyers in the tertiary market are investors, and the discount rate they apply to policies they purchase is primarily driven by the investor's costs of capital, and the current supply and demand of policies; thus, individual life expectancy estimates are far less important.

46. Buyers in the tertiary market—frequently large institutional investors seeking exposure to the uncorrelated yield of life settlements—typically do not buy policies one at a time. Rather, tertiary market buyers generally buy groups of policies in pools, assessing the risk and appropriate discount rate on a pool-wide basis.

47. The buyers in the tertiary markets have their own internal pricing models, LEs, and diligence processes to arrive at the ideal price for their investments in life settlements. Because many tertiary market buyers are general partners of investment funds, it is not unusual for those buyers to rely primarily on a single life expectancy provider to ensure consistent daily and weekly marking of the fund units backed by their array of policy acquisitions.

48. Abacus has realized trade spreads (gains-on-sale for policies sold) in excess of 20% each of the last six fiscal quarters. These gains do not reflect a particular method for calculating life expectancy; rather, they reflect Abacus's competitive edge and ability to optimize premium schedules by identifying the true cost of insurance for a particular policy, thereby reducing cash outflows and maximizing upside.

49. Abacus's trade spreads also reflect the high demand for policies in the tertiary market by investors who are unable or unwilling to overcome the high barriers to entry in the secondary market. Life settlements

providers like Abacus undertake substantial costs related to licensing, origination, and marketing so that they may purchase policies directly from the insured persons. The trade spreads reflect the premium investors are willing to pay for Abacus's access to this market.

50. As discussed in further detail below (*infra* ¶¶ 68–76), Abacus's valuation of policies it holds on its balance sheet reflects its historical success in realizing these trade spreads in the tertiary market. Just like Abacus, the sophisticated institutional investors that buy policies from Abacus use an array of LE providers and take LEs into account in their own way. The prices reached between the willing seller (Abacus) and each willing buyer are the product of all of the factors discussed above (*supra* ¶ 37), from the perspective of both sides of the deal.[1]

51. Again, Defendants are keenly aware of these market dynamics, and the unimportance of individual LE providers with respect to those dynamics, because they are Abacus's largest competitor in the tertiary market.

[1] If, as Coventry has suggested, (i) the LE was a determining factor in price; and (ii) one LE provider was consistently wrong in one direction (say, if their LEs were too short); and (iii) Abacus relied on that LE provider to value either the policies on its book or a large portion of the policies it sought to trade, then Abacus would be systematically overpricing its policies relative to fair market value, it would not be able to find sophisticated repeat trading partners, and its business would be shrinking. But because none of the preceding conditions is true, Abacus is only getting larger and gaining more market share.

Case 6:25-cv-01001-RBD-RMN Document 81-3 Filed 09/12/25 Page 20 of 80 PageID 839

## II. ABACUS AND COVENTRY HAVE A HISTORY OF DOING BUSINESS IN VERY DIFFERENT WAYS.

52. On a surface level, Coventry and Abacus both fill the intermediary role of buying policies on the secondary market and trading them on the tertiary market. But each company's practices shed light on the current state of the life settlements space and expose Defendants' motives for attacking Abacus.

### A. Coventry's Checkered History

53. Coventry claims on its website to have coined the term "life settlement" in 1998. It has also garnered more than its fair share of negative attention for how it has sourced the life insurance policies it purchases.

54. Upon information and belief, Coventry first began buying life insurance policies on the secondary market in 2000. Upon information and belief, Coventry generates profits well above industry standards in many cases by paying policyholders less than a fair price for their policies. Coventry has bragged to investors that it can realize 40–60% profits on a given policy, up to three times the average Abacus realizes.

55. Over the next two decades, these high profit margins lifted Coventry to the top of the life settlements business in terms of total policies purchased and total revenue. Coventry grew to dominate the secondary market—in 2022, Coventry and its wholly-owned affiliate Life Equity LLC

bought 52.1% of the life insurance policies sold by policyholders in the United States.

56. This growth did not come without criticism, or, indeed, legal exposure. In 2006, the Office of the New York Attorney General accused Coventry of bid-rigging and aiding and abetting breaches of fiduciary duty perpetrated by insurance brokers against their clients. *See* Complaint, *New York v. Coventry First LLC, et al.*, Index No. 0404620/2006, 2006 WL 6199670 (N.Y. Sup. Ct. Oct. 26, 2006).

57. The next year, OIR opened an investigation into Coventry for similar practices, which resulted in a consent order requiring Coventry to adopt a remedial business plan. *In re Coventry First LLC*, No. 88270-06-CO (Fla. OIR Sept. 28, 2007).[2]

58. Coventry has also been a leading player in the so-called "stranger-originated life insurance" ("STOLI") space, which refers to the practice of a lender providing up-front financing of life insurance policies for seniors who could not otherwise afford to obtain them, in exchange for the lender taking control of the policy after a reasonable interval. STOLI policies have been highly controversial.

---

[2] *Available at* https://floir.com/docs-sf/default-source/life-and-health/coventryfirst88270-06-co.pdf?sfvrsn=214bcecb.

59. As discussed in a 2010 report from the SEC's Life Settlements Task Force, STOLI policies are "inconsistent with the historical social policy of insurance, which is to protect families and businesses from potential economic hardship caused by untimely death of the insured," "may encourage insurance fraud," and "could make life insurance more expensive."[3]

60. Moreover, several courts across the country have expressly held that STOLI policies, and particularly ***Coventry's STOLI policies***, are "***illegal***" insofar as they allow a third party to take out an insurance contract for a life in which they do not have an insurable interest. In *Estate of Malkin v. Wells Fargo Bank, NA*, 998 F.3d 1186 (11th Cir. 2021), the Eleventh Circuit explicitly upheld a lower court ruling invalidating an insurance policy, the circumstances of which "[did] not show [the insured], [the broker], and Coventry intended to purchase the Policy for lawful insurance purposes. . . . Rather, the arrangement appears to . . . create an illegal wagering contract by which Coventry gambled on [the insured's] life and from which Coventry and [the broker] profited." *Id.* at 1196–97.

**B. Abacus Empowers Its Clients And Its Investors.**

61. Abacus has built its business on a fundamentally different model than Coventry's. Rather than buying low from seniors and selling high to investors, Abacus is developing a comprehensive suite of products and

[3] Life Settlements Task Force, Staff Rep. to U.S. Sec. & Exch. Comm'n 12–13 (2010), https://www.sec.gov/news/studies/2010/lifesettlements-report.pdf.

solutions around the life settlement asset to serve a variety of stakeholders. As the only publicly-traded life settlements company, Abacus functions as both an originator and market maker of this asset; it also publicly discloses its valuation methodologies and financial statements.

62. Abacus has purchased $10 billion in face value of policies since 2004. Abacus Global Management, Inc., Annual Report (Form 10-K), at 2 (Mar. 28, 2025) ("Abacus 2024 Form 10-K"). In 2023, the Company went public through a de-SPAC transaction with East Resource Acquisition Company. The next year, Abacus purchased 22% of the face value of policies sold on the secondary market.

63. Abacus is committed to expanding the underlying premise of life settlements—that one's lifespan can be treated as a monetizable asset—into newly profitable investment strategies beyond the ultimate maturity of the underlying policies. Abacus has expanded its reach and built its reputation in large part through the "Abacus Pays" portal, a free online policy value calculator that informs policyholders of the approximate NPV of their policy based on basic demographic characteristics, policy type, and face value. This transparency, in marked contrast to Coventry's practices, has resulted in Abacus making larger life settlement payments to policyholders, measured as a percentage of policy face value, than its competitors.

64. Today, four divisions of the public entity, Abacus Global Management, Inc., are driving its growth:

a. **Abacus Life Solutions** buys policies in individual secondary life settlement transactions, and specializes in raising awareness among consumers of the life settlement path, including through direct marketing and by outreach to financial advisors and their client networks.

b. **Abacus Asset Group** serves "institutional investors alongside select private clients, providing excess returns across the risk-reward spectrum" through a suite of public and private fund offerings.

c. **Abacus Wealth Advisors** is a registered investment adviser leveraging more than two decades of proprietary data and algorithms that helps financial advisors create customized plans based on clients' health, longevity, and overall financial wellbeing.

d. **ABL Technologies** creates technology products that are revolutionizing the life planning industry by processing and analyzing an ever-expanding universe of mortality data, not only improving the precision of pricing that the Life Solutions division can offer to policyholders, but also delivering valuable data resources to pension funds, government agencies, and insurance-related businesses that may struggle to track members and beneficiaries without cutting-edge tools. The division has developed platforms that conduct real-time mortality verification, locate missing participants, and service the secondary life insurance market with unprecedented speed and accuracy.

65. In addition, on October 16, 2024, a newly-organized Abacus affiliate, ABL Longevity Growth and Income Fund (the "Fund"), filed a preliminary prospectus with the SEC, seeking approval to launch an interval fund—a specialized type of investment company that continually offers shares for purchase, but only permits repurchase or sale of shares on a

quarterly basis. ABL Longevity Growth and Income Fund, Preliminary Prospectus (Form N-2) (Oct. 16, 2024).[4]

66. The Fund is a vehicle for extending the opportunities that institutional investors realize through the Abacus Asset Group to a broader class of retail investors.

67. The Fund is purpose-built to act as a buyer on the tertiary market. Unlike Abacus Life Solutions, the Fund does not participate in secondary market purchases, and will not reach out to policyholders directly, nor will the Fund buy any policies from any Abacus affiliate (which is expressly prohibited by the Investment Company Act of 1940).

## III. ABACUS AND ITS AFFILIATES MAKE CLEAR AND CONSISTENT DISCLOSURES REGARDING THEIR VALUATION METHODOLOGIES.

### A. Abacus Uses A Fair Value Approach.

68. Beginning in October 2024, Coventry launched a campaign falsely claiming that Abacus misrepresents the value of policies on its balance sheet. Coventry's central accusation—that Abacus uses Lapetus life expectancy estimates to inflate the value of policies on Abacus's books—is demonstrably false, as Abacus's public disclosures make clear.

---

[4] The Fund recently filed updated N-2s on June 17, 2025 and August 15, 2025. *See* ABL Longevity Growth and Income Fund, Preliminary Prospectus (Form N-2) (June 17, 2025); ABL Longevity Growth and Income Fund, Preliminary Prospectus (Form N-2) (August 15, 2025).

69. For one thing, Abacus has never stated that it uses a single life expectancy provider for any part of its deal flow or valuation. For another, ***as it has repeatedly disclosed, Abacus does not use a life expectancy valuation model to value the policies on its balance sheet*** **(instead, it uses tertiary market-based fair value accounting pursuant to GAAP)**.

70. Using a single LE as the predominant variable in fair value analysis that reflected trade spreads would be inappropriate, because the parties with whom Abacus trades do not price policies based on a single LE—they take into account the broader set of inputs set forth above (*supra* ¶ 37).

71. For the vast majority of its policies, Abacus realizes revenues from trading the policies to investors, not from claiming the death benefit. The trade value of the policy is far more salient than the anticipated cash flows from holding a policy until maturity.

72. Therefore, the fair value calculation Abacus actually uses reflects the value it could reasonably expect to capture in a subsequent transaction.

73. As of 2025, over 99% of the policies on the Company's balance sheet were valued using the fair value method, which dictates "fair value as ***an exit price*** representing the amount that would be received if an asset were sold or that would be paid to transfer a liability in an orderly

transaction between market participants at the measurement date." Abacus 2024 Form 10-K at 80 (emphasis added).[5]

74. The annual report reminds investors (and competitors, should they be reviewing each and every filing, as Buerger claims he does) that "fair value is a market-based measurement," which "reflect[s] assumptions about what factors market participants would use in pricing life settlement policies." *Id.*

75. These disclosures indicate that Abacus values over 99% of the policies on its balance sheet based on assumptions about the value of tertiary market transactions.

76. Since Abacus became a public company, Grant Thornton, a reputable public accounting firm, has audited the Company's consolidated financial statements and has issued unqualified opinions, including as to this valuation approach.

---

[5] Abacus values the life insurance policies on its balance sheet in accordance with ASC 325-30, *Investments in Insurance Contracts*. As explained in the Company's most recent annual report, dated March 28, 2025:

> For all policies purchased after June 30, 2023, the Company accounts for these under the fair value method. For policies purchased before June 30, 2023, the Company elected to use either the fair value method or the investment method (cost, plus premiums paid). The valuation method is chosen upon contract acquisition and is irrevocable.

*Id.*

### B. The Fund Uses A Fair Value Approach.

77. The Fund is a separate pending investment product, and the value of which will be based on assets other than those Abacus holds on its balance sheet. As part of the SEC registration process, which is still ongoing, the Fund also discloses its valuation methodology. In the most recent Form N-2 filed with the SEC before Buerger's most recent inflammatory statements (*see infra* ¶¶ 143–151), the Fund disclosed that it relies on "[t]he Valuation Methodology developed by ABL Technologies that is leveraged by the Manager, enabl[ing] the Manager to deploy a dual criterion evaluation system." ABL Longevity Growth & Income Fund, Preliminary Prospectus (Form N-2) at 3 (Apr. 14, 2025) ("April 14 Form N-2"). The two criteria are as follows:

> a. "The first criterion focuses on the valuation of Mortality Contracts using a defined risk-adjusted market discount rate, coupled with a projected life expectancy. ***The market discount rate is derived from ABL Technologies' proprietary database of historical transactions completed by the Sponsor and its affiliates that span the prior rolling five-year period***, which are then adjusted for policy specific risks (including factors such as life expectancy, maturity date, and premiums)."
>
> b. "The second criterion derives its valuation from the cost basis of the Mortality Contract and is adjusted based upon our risk-adjusted historical trade spread. This inclusion allows the Fund to consider the dynamics of ***historical trading of over 1,000 realized Mortality Contract trades spread on average***, evenly over the prior five-year period."

*Id.* at 3–4 (emphasis added).

78. In other words, the ABL Technologies formula for valuing the life insurance polices that the Fund will purchase—which it values as a pool making up the assets of the Fund—depends upon historical transactions in the tertiary market. Or, as the Fund disclosed in the same Form N-2: "[f]or purposes of calculating [net asset value], portfolio investments are valued using fair value." *Id.* at 45. Meanwhile, the Fund manager has no particular interest in those fair value marks; management fees are charged ***the lower of*** the fair value mark or the purchase price of the asset, so that the manager has no incentive to inflate the marks of Fund assets in the fair value analysis. *Id.* at 44.

**C. In 2024, the Fund First Disclosed Lapetus As Its Primary LE Provider.**

79. Separately, the Fund discloses that "[t]he value of an ***individual*** Mortality Contract is determined through the development of probabilistic survivability curves based on the medical underwritings . . . such as those provided by ITM 21st, Fasano & Associates, Predictive Analytics, Lapetus Solutions, Polaris, and LSI Longevity Solutions Inc." *Id.* at 45–46 (emphasis added). Those six firms provide life expectancy estimates.

80. The Fund has been clear in its disclosures to the SEC throughout the registration process: it is set up to act as a tertiary market participant,

which, as a matter of practice, rely on a single LE for all of their policies in order to ensure consistent day-to-day marking.

81. Accordingly, while the Fund reviews all available LEs for a particular policy, the Fund discloses that "[c]onsistent with standard practice in the life settlement market, the Manager will typically engage a single life expectancy provider with respect to any given Mortality Contract." From February 2024 through August of 2025, the fund identified Lapetus as its anticipated primary LE provider.

82. But no matter the LE provider the Fund uses for its daily marks, it remains an interval fund that, if registered, will distribute investor risk across hundreds of policies. ***Once the Fund is registered, no investor in the Fund will ever buy or sell units based on a valuation derived solely from an LE***; rather, units will be exchanged according to the net asset value ("NAV") calculation generated by the ABL Technologies algorithm, which is based on "fair value," in particular "historical trading" on the tertiary market. ABL Longevity Growth & Income Fund, Preliminary Prospectus (Form N-2) at 46 (Aug. 15, 2025).

83. The Fund had good reason to select Lapetus as its primary LE provider. The Fund's disclosures explain that Lapetus's "data set is significantly larger than other life expectancy providers" and Lapetus (unlike other providers) engages in medical underwriting. April 14 Form N-2 at 46

84. Also, the Fund decided to use Lapetus because it knows Lapetus to be an honest broker. The Fund and Abacus have reason to believe that other LE providers have shared confidential policyholder data with Coventry to give Coventry a competitive edge in bidding processes.

85. The Fund understands that Lapetus has not succumbed to Coventry's pressure to engage in these unfair and deceptive tactics. And so, it chose Lapetus as the primary LE provider.

86. Besides, many life settlements providers use Lapetus LEs as a data point, including Coventry. ***Since 2019, Coventry has purchased over 4,000 LEs from Lapetus.*** As recently as 2024, Coventry was offering bundles of policies for sale to investors using Lapetus LEs as a pricing input. One of these offers came directly from Coventry's CEO, Reid Buerger. Upon information and belief, prior to 2024, Coventry was one of Lapetus's largest customers, making up over a quarter of Lapetus's business.

## IV. WITH ABACUS GAINING MARKET SHARE, REVENUE, AND RESPECT IN THE MARKET, COVENTRY SEEKS TO DISCREDIT LAPETUS AND DESTROY ABACUS'S REPUTATION.

87. The trigger for Defendants' defamation campaign occurred on February 2, 2024, when the Fund first disclosed its selection of Lapetus as its preferred life expectancy provider for single policy purchases. Since that

time, Coventry has pursued an array of media strategies to convince the market of three lies clearly refuted by Abacus in its public disclosures:

a. Lapetus life expectancies are inaccurate;

b. Abacus uses Lapetus LEs to inflate the fair value of policies on its balance sheet; and

c. Abacus's realized gains are the product of fraud, and the company's stock is overvalued because of its reliance on Lapetus.

88. As set forth below (*infra* ¶¶ 89–151), Defendants' efforts to discredit Lapetus, and associate Lapetus with the value of Abacus—even though no such association exists—have been brazen, persistent, and defamatory.

**A. Defendants Fail to Coerce Lapetus, then Discredit Lapetus to Hurt Abacus.**

89. Defendants have been eager for a way to take down Abacus since the Company first went public in June of 2023.

90. Upon information and belief, as early as October of 2023, Defendants have been spreading false statements that Abacus owns Lapetus and that Abacus uses Lapetus to obtain "favorable" LEs.

91. Industry insiders told Abacus employees that Coventry was going to use Abacus's falsely-claimed "ownership" of Lapetus to damage the image and stock price of Abacus, with one broker telling an Abacus employee that Coventry viewed Lapetus as the only thing Coventry had "against" Abacus.

92. A few months later, in February 2024, after the Fund filed its first N-2, Coventry wrote a letter to the SEC highlighting what it purported to be actionable conflicts of interest (an oblique reference to Abacus) and accounting misstatements. The SEC took no action on the February 2024 letter.

93. On May 7, 2024, a few months after the Fund first disclosed its selection of Lapetus, Buerger called Dr. Jay Olshanksy, the Chief Scientist and co-founder of Lapetus.

94. Buerger expressed his view that Lapetus LEs were shorter than others in the industry, and specifically expressed his concern that Abacus in particular was using Lapetus LEs. Dr. Olshansky later reported to the CEO of Lapetus that Buerger was “very annoyed” by Abacus, and that Buerger “appeared to have a particular ax to grind regarding Abacus.”

95. Buerger asked Dr. Olshanksy whether he (Olshansky) wanted Lapetus’s clients, like Coventry, “to make money.” Buerger also suggested that Lapetus lengthen its LE estimates so that Lapetus and “others in the industry . . . have our goals aligned with the investors.”

96. Upon information and belief, Buerger contacted other LE providers with similar requests, and those other providers agreed to lengthen their estimates, which gave Coventry and Buerger an “independent” estimate to justify paying seniors lower prices for their policies.

97. But Lapetus was different. Dr. Olshansky, a university professor and nationally-recognized expert who has been publishing on the topics of longevity and aging for three decades, responded that Lapetus had to maintain its independence from its clients and its clients' investors.

98. Apparently, Buerger did not get what he wanted from Lapetus or Dr. Olshansky. So, the same day that Buerger spoke to Dr. Olshansky, Coventry published an "internal review" of Lapetus's life expectancy estimates purporting to show that Lapetus's estimates were "consistently and materially shorter than those issued by other life expectancy providers, potentially leading to the overvaluation of life insurance policies and investor losses." Coventry then concluded that its "results cast doubt on the accuracy of asset valuations based primarily on Lapetus life expectancies."[6]

99. Then, in July 2024, Coventry commissioned an "independent study," performed by two professors to "replicat[e]" and "confirm[] the results of [Coventry's] internal analysis." Coventry's core claim is that Lapetus LEs are shorter for 85% of underwritten cases, and that the average difference is 31 months. Coventry went on to opine "valuations based on Lapetus life

[6] *Coventry Study Finds Lapetus Life Expectancies are Shorter than Competitors in 85% of Cases Reviewed*, Coventry (May 7, 2024), https://www.coventry.com/coventry-study-finds-lapetus-life-expectancies-are-shorter-than-competitors-in-85-of-cases-reviewed/.

expectancies could lead to significantly inflated asset values and investor losses."[7]

100. Despite Coventry's harmful and untrue statements that using Lapetus LEs could lead to "investor losses," it continued purchasing LEs from Lapetus.

101. On October 24, 2024, Buerger spoke at the Life Insurance Settlement Association ("LISA") Life Settlement Conference, in Miami. The occasion for his remarks was discussion between Buerger and Dr. Olshanksy, CEO of Lapetus, held in front of an audience of life settlements industry professionals.

102. In a video of the presentation available on YouTube, Buerger doubles down on the claims in Coventry's "internal review," stating, among other things, that Lapetus systematically underestimates life expectancy. Buerger repeatedly challenged Lapetus's work, but when asked by Dr. Olshansky to review the underlying data together, refused that offer.[8]

103. Specifically, Dr. Olshansky presented data on the over 4,000 LEs Lapetus had generated for Coventry, and showed that for ***over*** 95% of the

---

[7] *Coventry Releases Peer Review of Lapetus Life Expectancy Study*, Coventry (July 22, 2024), https://www.coventry.com/coventry-releases-peer-review-of-lapetus-life-expectancy-study/.

[8] *See* Opening Keynote Fireside Chat Between Buerger and Dr. Olshansky at the 30th Annual Life Settlement Conference (YouTube, Oct. 25, 2025), https://youtu.be/-xwCWTM33VY?feature=shared&t=4482 (the "Fireside Chat").

LEs Lapetus had provided to Coventry as of that date, Lapetus had ***overestimated, not underestimated***, life expectancy. In such cases, the individual insured passed away earlier, not later, than estimated, and Lapetus's LE estimate was ***too long***, rather than too short, as claimed by Buerger.

104. By way of response, Buerger claimed that he did not understand what Dr. Olshansky was telling him, but remained firm in his belief that Lapetus life expectancies were so incorrect that they posed an "existential threat" to the life settlements industry.

105. When asked about Abacus, Buerger said "I don't think its appropriate . . . for me to comment on Abacus . . . ." But then he could not help himself; he began talking about a valuation "using Lapetus at a discount rate of **21%**." Buerger stated that Coventry does not "use a discount of **21%, because 21%, we all know . . . [is] not realistic**." (emphasis added).

106. Buerger then stated that "fair market value is grossly overstated, even if you use **21%**" based on his "knowledge of the market." (emphasis added).

107. Buerger did not pull 21% from thin air, and it was not meant to understood in the room as a hypothetical. He was talking about Abacus.

108. As Buerger would later admit, he reads every Abacus SEC filing. Thus, he picked 21% during his diatribe because Abacus had disclosed a 21%

discount rate in its fair value calculation in its last quarterly filing before the LISA conference:

> For policies carried at fair value, the valuation is based on Level 3 inputs that reflect our assumptions about what factors market participants would use in pricing the asset or liability, such as life expectancies and cash flow discount rates. The inputs are developed based on the best available information, including our own data. The valuation model is based on a discounted cash flow analysis and is sensitive to changes in the discount rate used. ***The Company utilized a blended average discount rate of 21% and 21% for policy valuations*** at June 30, 2024 and at December 31, 2023, respectively, which is based on economic and company-specific factors. The Company re-evaluates its discount rates at the end of every reporting period in order to reflect the estimated discount rates that could reasonably be used in a market transaction involving the Company's portfolio of life settlements.

Abacus Global Management, Inc., Quarterly Report (Form 10-Q) at 22 (Aug. 12, 2024) (emphasis added).

109. Because Buerger did not tell the audience at the LISA Conference that Abacus's August 12, 2024 disclosure regarding its methodology did not mention Lapetus, his suggestion that Abacus was "using Lapetus at a discount rate of 21%" was false and misleading. Buerger knew that his statements were incomplete, having read every one of Abacus's filings, and thus spoke with, at a minimum, reckless disregard for the truth of the metrics Abacus actually uses to generate its fair value calculation.

110. Buerger also failed to explain that the paragraph he pulled the 21% number from makes clear that Abacus does not "use Lapetus" to derive its discount rate; rather, the filing Buerger clearly read before the LISA conference states that the discount rate used by Abacus "reflect[s] the

estimated discount rates that could reasonably be ***used in a market transaction*** involving the Company's portfolio of life settlements." *Id.* (emphasis added).

111. No one with Alan Buerger's four decades of experience in the secondary and tertiary markets for life insurance policies would read Abacus's public filings and have any reasonable basis to say that Abacus (and every one of its trading partners) was "using Lapetus" to define its discount rate. Therefore, Buerger's claims that Abacus's discount rate is based on Lapetus LEs were objectively unreasonable under the circumstances.

112. Nonetheless, after saying that "fair market value is grossly overstated, even if you use **21%**"—clearly referring to Abacus—Buerger made another false claim: the "$250 million dollars out there that investors have put up" with Abacus "is dead." (emphasis added).

113. He continued, "and I worry that it's going to be $300, $400, $600, and $1 billion. With Mutual Benefits, it was $800 million. . . . It's going to be awful for us. The longer it takes, and the bigger it gets, the worse it will be."[9] By referring to the Mutual Benefits Corporation, Buerger implied Abacus was similar to a company that conducted one of the largest Ponzi schemes in Florida's history, and whose CEO has been sentenced to 20 years in prison.

[9] *See* Fireside Chat, *supra* note 8.

### B. Coventry Runs To Abacus's Auditor And Then The SEC About The Fund's Disclosure With Respect To Lapetus.

114. Unsatisfied by its efforts to bring down Abacus by bringing down Lapetus, Coventry took its defamation campaign a step further. On information and belief, a week after Abacus's Lapetus disclosure in the Fund's N-2 on February 2, 2024, Coventry approached a partner at Abacus's auditor, Grant Thornton. Coventry tried to influence Grant Thornton's audit of Abacus's audited financials by disseminating the same lies that were disseminated to other third parties, including the false and misleading statements contained in Coventry's own study of Lapetus's life expectancy estimates (as "confirm[ed]" by the professors it paid) and that Abacus uses Lapetus in its valuation process.

115. On November 1, 2024, nine months after the Fund first mentioned Lapetus in its registration statement, but within days of the letter to Grant Thornton and Buerger's public comments, the SEC curiously and suddenly issued a Comment Letter on Abacus's Form S-1/S-3 filing, asking the Fund to "provide a detailed explanation of any relationship and disclose the extent to which you have relied upon Lapetus or any of its co-owned entities for valuation of life insurance policies."[10]

---

[10] *See* Abacus's Resp. to SEC Nov. 1, 2024 Comment Letter (Nov. 4, 2024), https://www.sec.gov/Archives/edgar/data/1814287/000162828024044861/filename1.htm.

116. On information and belief, the SEC issued the November 1 comment letter because Coventry contacted the SEC in October of 2024 and urged the SEC to inquire further into Abacus's disclosures about Lapetus.

117. In the SEC November 1 comment letter, it asked pointed questions about (1) whether Abacus or its officers and directors had an interest or relationship in Lapetus and (2) "[i]f Lapetus is a related party," what limitations that placed on Abacus's ability "to value life insurance policies under any relevant state laws."[11] These questions from the SEC largely mirror the accusations contained in the letter from Coventry to Abacus's auditor as well as the biased conclusions contained in Coventry's internal study. *See infra* ¶¶ 114, 120–124.

118. In any event, Abacus disclosed the truth to the SEC, investors, and the public that Abacus and Lapetus are not related parties, and that Abacus complied "with all relevant state laws." Abacus also disclosed that with respect to Abacus's valuation process, "Lapetus's role involves generating life expectancy reports, which [Abacus] incorporates as one of multiple inputs into its valuation process." Indeed, Abacus further disclosed that "it does not rely solely . . . on Lapetus's life expectancy reports." And critically, "Lapetus does not engage in the valuation of policies" thus,

---

[11] *Id.*

Case 6:25-cv-01001-RBD-RMN Document 38 Filed 09/12/25 Page 41 of 81 PageID 139

Abacus's "use of Lapetus as an input" is "limited and immaterial to [Abacus's] overall valuation process."[12]

119. After reviewing these fulsome disclosures, the SEC did not raise any concerns about Abacus's valuation methodology or the relationship between Lapetus and Abacus again.

**C. Coventry Commissions A Hit Job On Lapetus With The Goal Of Harming Abacus.**

120. Having failed to gain traction through its direct attacks on Abacus's auditor, analysts, and regulators, Coventry escalated its campaign.

121. To add a veneer of legitimacy to its attacks on Lapetus and Abacus, in December 2024, Coventry commissioned a "comprehensive new study" purporting to show that Lapetus's life expectancy estimates were far shorter than other providers.[13] What Coventry failed to disclose about this purportedly objective analysis is that *Coventry paid* the two professors to validate the conclusions in Coventry's predetermined narrative, which

[12] *Id.*

[13] *Flaws in Lapetus Life Expectancy Estimates Exposed in New Study Following Olshansky-Buerger Debate at LISA Conference*, Coventry (Feb. 10, 2025), https://www.coventry.com/flaws-in-lapetus-life-expectancy-estimates-exposed-in-new-study-following-olshansky-buerger-debate-at-lisa-conference; *see also* Daniel Bauer & Nan Zhu, *Lapetus Actual-to-Expected Deaths Study* (Dec. 2024), https://www.slideshare.net/secret/9fjnG9zXIx1jM8?ref=morpheus-research.com.

Coventry had already set out in its May 2024 "internal review" and paid the two professors to "confirm[]" in July 2024 in an "independent" review.[14]

122. Lapetus refuted the Coventry studies with its own independent analysis. Lapetus's auditor examined Lapetus data "with matched medical records" for the same lives in Coventry's analysis and concluded that "Lapetus has proved to produce more accurate estimates" than its competitors, and that "[there] is no direct evidence at this stage to suggest that the life estimates produced by other LE providers will prove to be more accurate for such lives."[15]

123. Coventry published a press release stating only the high-level "conclusions" of its "new study," but did not make the details of the study public.[16] Coventry hides the details underlying its attacks on Lapetus behind a click-through agreement that requires anyone who wants to see the various Coventry studies to agree that they will only access it "for informational

---

[14] *Coventry Releases Peer Review of Lapetus Life Expectancy Study*, *supra* note 7.

[15] Daniel G. Ryan, COIOS Limited, *Independent Assessment of Lapetus Methodology for Estimating Individual Lifespans* (June 4, 2025). To be sure, Lapetus maintains a license to operate in Florida, which has one of the nation's most stringent regulatory frameworks. Among other things, Lapetus must (i) file routine audits by "a nationally recognized actuarial firm," of all life expectancy calculations, including "actual-to-expected ratio[s] of life expectancies" across seven time categories; (ii) maintain detailed "policies and procedures covering all life expectancy determination criteria and protocols"; and (iii) provide OIR with "[a] description of the training, including continuing training, of the individuals who determine life expectancies." Fla. Stat. § 626.99175.

[16] *Flaws in Lapetus Life Expectancy Estimates Exposed in New Study Following Olshansky-Buerger Debate at LISA Conference*, *supra* note 13.

purposes."[17] And even if one fills out the form, it is only to "Submit [a] Request," which requires the interested party to provide its name, email address, phone number, company, publication, and which document the party is interested in.[18] There is no guarantee that, once the user forfeits the information, they will actually gain access to the various Coventry Studies.

124. The Coventry studies serve not as genuine research but as a manufactured credential—allowing Coventry to cite purportedly independent academic findings while ensuring the underlying methodology remains hidden from scrutiny. This approach enables Coventry to disseminate its false claims about Lapetus and Abacus across multiple platforms while avoiding accountability for the study's flawed foundations.

### D. Coventry Tells Market Analysts At TD Securities To Downgrade Abacus Based On The Coventry Studies.

125. Coventry was trying, and largely not succeeding, in convincing the market that Lapetus was wrong, and thus Abacus was misvaluing the insurance policies it owned. Yet sophisticated institutional investors and market analysts disagreed, likely because Abacus repeatedly disclosed that its asset valuation was based on market transactions and "reflect[ed] . . . assumptions about what factors market participants would

[17] *Request Lapetus Life Expectancy Study Information*, Coventry, https://www.coventry.com/research/ (last visited September 17, 2025).

[18] *Id.*

use in pricing life settlement policies," and not on the output of a single life expectancy provider. Abacus 2024 Form 10-K at 80.

126. On March 9, 2025, Coventry contacted TD Securities, one of the analysis firms that frequently comments on the strength and value proposition represented by Abacus's common stock. Later that day, an analyst at TD Securities emailed Abacus Chairman Jay Jackson and Abacus Chief Financial Officer Bill McCauley, stating that an "Abacus competitor informed us of some recent . . . news" about Lapetus that required Abacus's feedback. The TD Securities analyst specifically referenced the statistics Coventry had put out about Lapetus in 2024.

127. Mr. Jackson later learned that the "Abacus competitor" was none other than Coventry. The analyst regurgitated the same biased conclusions and flaws in the Coventry studies, including that Lapetus has shorter life expectancies than other providers. Mr. Jackson made clear that Lapetus's estimates reported to the state of Florida are in line with other life expectancy providers. In addition, the analyst addressed the specter of concern raised by Coventry around Abacus's and Mr. Jackson's relationship with Lapetus which, according to Coventry, violates Florida regulations.

128. Abacus's communications with TD Securities continued with Abacus having to correct the myriad of false and misleading statements advanced by Coventry. For example, on March 21, 2025, the TD Securities

Case 6:25-cv-01001-RBD-RMN Document 31-3 Filed 08/18/25 Page 45 of 81 PageID 64

analyst asked Mr. Jackson "[w]hat percentage of the life settlement policies on your books are based on Lapetus LEs to set the fair value?"—apparently buying the line from Coventry that the fair value calculations depended on Lapetus life expectancies, when in fact, the Lapetus LEs are not used *at all* in the fair value analysis.

129. A few weeks later, in an April 2025 phone call between Mr. Jackson and the TD Securities analyst, Mr. Jackson learned not only that Buerger was the "industry source" sowing doubt to TD Securities, but that Buerger reached out to TD Securities directly to inform the analyst that Abacus's balance sheet was overvalued due to Abacus's use of Lapetus's life expectancy estimates. The goal? Buerger suggested to the analyst that TD Securities ***drop its coverage*** of Abacus's stock.

130. TD Securities did not follow that invitation, convinced that Coventry's co-founder and Chairman's smear campaign was simply not true.

### E. Coventry Files a Meritless Lawsuit Seeking Lapetus's Trade Secrets, While Simultaneously Smearing Abacus For Using The Data.

131. At the same time, Coventry made defamatory statements about Abacus directly to regulators as part of a pleading seeking disclosure of information Lapetus provided to Florida OIR. *See* Petition for Writ of Mandamus and Expedited Hearing for Violations of Florida's Public Records Act, *Coventry First LLC v. Fla. Office of Ins. Regul. & Lapetus Sols., Inc.*,

Case No. 2025 CA 000463 (Fla. 2d Cir. Ct. Mar. 21, 2025) ("Coventry Writ" or the "Writ").

132. A few weeks after the initial email exchange between Mr. Jackson and the TD Securities analyst in which Mr. Jackson informed the analyst of the life expectancy data reported to Florida regulators, Coventry filed a petition to gain access to Lapetus's Florida audit reports. *Id.* The Coventry Writ alleged that the OIR violated Florida's Public Records Act because OIR did not satisfy Coventry's request to produce the life expectancy audit reports that Lapetus is required to submit to OIR. *Id.* ¶¶ 3–4, 16. Coventry claimed that Lapetus's "issuance of chronically short Life Expectancies has skewed the entire life settlement market." *Id.* ¶ 18.

133. Regardless of the "merits" of Coventry's claim, Coventry's true motivation for its Writ is laid bare in paragraph 18 of the Writ—yet another public vehicle to attack Abacus by way of attacking Lapetus.

134. Although wholly irrelevant to Coventry's claimed right to the information held by OIR, the Writ alleged that Lapetus's "Life Expectancies have substantial influence on the market through . . . [its] *unique relationship* with Abacus Global, ***a group of life settlement companies which use LAPETUS as their preferred Life Expectancy provider***." *Id.* (emphasis added). Abacus has never made any such claim.

135. The support Coventry cites to underscore this "unique relationship"? A ***prior unpaid*** nominal board position held by Mr. Jackson in which Mr. Jackson was in an advisory position, he did not have authority or capacity to act on Lapetus's behalf, and he was only minimally involved with Lapetus's operations.[19] And Abacus purportedly "invest[ed] heavily in Lapetus." The heavy investment? A $1 million convertible note, that may result in at most 5% ownership upon conversion, which "would not grant [Abacus] any influence or control over Lapetus."[20]

136. Coventry falsely asserts that Mr. Jackson's prior Lapetus board position and the minor convertible note Abacus maintains in Lapetus "may violate the Life Expectancy reform law passed by the legislature in the wake of the Mutual Benefits collapse," and goes on to falsely compare Abacus to Mutual Benefits: "Because Mutual Benefits exerted pressure on its life expectancy providers, whom it could control because of their relationships, the legislature now requires independence between settlement providers and Life Expectancy providers. . . . The relationship between Lapetus and Abacus is so close that an Abacus company has, despite the overwhelming evidence that Lapetus issues by far the shortest Life Expectancies in the market,

[19] *See* Abacus's Resp. to SEC Nov. 1, 2024 Comment Letter (Nov. 4, 2024), https://www.sec.gov/Archives/edgar/data/1814287/000162828024044861/filename1.htm.

[20] *See id.*

bizarrely asserted that 'Lapetus Solutions provides the most conservative (i.e., the longest) life expectancy predictions.'" Coventry Writ ¶ 18 n.4.

137. The Coventry Writ also contains the clearest statement of Coventry's Big Lie: "One of the Abacus companies, **Abacus Life Inc.[21]—the main asset of which is life policies purchased by Abacus—is a publicly traded company whose shareholders' investments are dependent on the accuracy of the Life Expectancy estimates used to value policies**." *Id.* ¶ 20 (emphasis added).

138. This is not even a little bit true, about ***any*** securities issued by any Abacus entity. The stock of the publicly traded company is valued according to "an exit price representing the amount that would be received if an asset were sold or that would be paid to transfer a liability in an orderly transaction between market participants at the measurement date." Abacus 2024 Form 10-K at 80.

139. The units of the Fund—which ***has no investors because it has not yet been approved***—will depend upon "ABL Technologies' proprietary database of historical transactions" and its "risk-adjusted historical trade spread." April 14 Form N-2 at 4.

140. Neither metric depends solely upon a specific life expectancy calculation, let alone Lapetus's. Rather, Lapetus is one of six life expectancy

[21] Abacus Global Management, Inc. was previously named Abacus Life Inc.

providers that Abacus may consider for initial policy pricing and Abacus relies on market transactions to value the policies it holds on its balance sheet.[22]

141. Once again, Coventry's assertions—both express and/or implied—are false. Abacus does not use Lapetus as its "preferred" Life Expectancy Provider (Coventry Writ ¶ 18), nor does Abacus use Lapetus as part of its valuation.

142. While Coventry recently voluntarily dismissed its Writ after Abacus filed its initial complaint (*see* Notice of Voluntary Dismissal, *Coventry First LLC v. Fla. Office of Ins. Regul. & Lapetus Sols., Inc.*, Case No. 2025 CA 000463 (Fla. 2d Cir. Ct. July 24, 2025), Coventry continues its quest for Lapetus's data and its campaign to publicly defame Abacus as an intervenor in a separate lawsuit Lapetus filed against OIR to prevent the very disclosure Coventry seeks. *See* Coventry First LLC's Mot. to Intervene as Party Defendant, *Lapetus Sols., Inc. v. Fla. Office of Ins. Regul.*, Case No. 2025 CA 000516 (Fla. 2d Cir. Ct. Apr. 10, 2025) (Coventry attaching its Writ as

---

[22] *See id.* Coventry's false statements about Abacus's compliance with Florida laws is particularly ironic where, as here, Coventry has long resisted any attempts by the OIR to regulate life settlement providers. For example, in 2010, Coventry attempted to block OIR's full review of company records in order to determine which files were subject to Florida laws. A federal appeals court affirmed OIR's right to inspect non-Florida records. And in 2023, Coventry filed to block an OIR request to examine almost six years of records from life settlement providers after the OIR launched the investigation into Coventry because it had received complaints about Coventry First and its subsidiary Life Equity in 2022.

Exhibit A to its Motion to Intervene); *see also* Order Granting Coventry First LLC's Motion to Intervene as a Party Defendant, *Lapetus Sols., Inc. v. Fla. Office of Ins. Regul.*, Case No. 2025 CA 000516 (Fla. 2d Cir. Ct. Aug. 4, 2025).

### F. Coventry Broadcasts Its View Of Abacus To A Wider Audience, Telling Market Analysts And Institutional Investors That Flaws In The Lapetus LE Indicate That Abacus "Will Implode" "Soon."

143. Following Coventry's bogus Writ filed in Leon County, Coventry continued its defamatory campaign when, on May 22, 2025, Buerger conducted an interview with Tegus, a subsidiary of AlphaSense, Inc. Tegus is a business intelligence and expert network firm that provides one-on-one interviews with industry experts to investors and subscribers.[23]

144. Tegus subscribers pay $20,000 or more annually to get access to interviews held with "industry experts" on various topics of interest. Tegus's subscribers include Fortune 500 companies, world-renowned private equity firms, hedge funds, and other institutional investors. The client that requests the specific interview gets priority on the expert information, but then these interviews are transcribed and the transcripts are emailed to all of Tegus's subscriber network after a waiting period.

145. Therefore, experts and industry insiders that sit down with Tegus or a Tegus client for an interview know that their words will be

[23] *See* AlphaSense and Tegus, https://www.alpha-sense.com/compare/alphasense-and-tegus/ (last visited Sept. 17, 2025).

transmitted to market-movers, including the blue-chip financial institutions that have played a part in Abacus's success over the past 20 years.

146. In the May 22 Tegus Interview, Buerger spoke almost exclusively about Abacus. After bragging that he had made Abacus his "***pet project***" and "know[s] every public document" Abacus has filed, Buerger doubled-down on his and Coventry's defamatory remarks about Abacus, Abacus's use of Lapetus, Abacus's valuation process, and even the financial health of Abacus as a company. Indeed, Buerger's false and misleading statements in the Tegus Interview include:

a. "***If you're a public company***, you're trying to generate steady progress in your quarterly earnings like any public company. ***The temptation that creates is to manufacture earnings***, which with a Level three asset is an easy temptation to fulfill. Specifically . . . Abacus uses Lapetus as their so-called independent medical underwriting company, ***not exclusively but primarily***." Buerger's meaning is unmistakable, and unmistakably false—these statements cannot be read to mean anything other than that Abacus uses Lapetus as its primary life expectancy provider. No public document says that, as Buerger is aware from his self-proclaimed close study of those filings. And Abacus does not use Lapetus to value the policies on its balance sheet. *See* Abacus 2024 Form 10-K at 80; *see supra* ¶¶ 68–78.

b. "The problem with that is the stockholders, the baby bondholders, and even the [Sagard] loan ***will be subordinated to the asset-backed debt***, which is to say they will all be wiped out when this thing goes upside down." The implication—that stockholders' equity is subordinated to debt backed by investments in assets, *i.e.* life insurance policies—is not only false, but is a dog whistle for anyone familiar with life settlements. "Asset-backed debt"—which Abacus carries none of—has been linked to other failed life settlement companies.

c. "[O]ther than very small, unsophisticated, frankly stupid investors, nobody's using Lapetus anymore." This contradicts the fact that Coventry itself, including Buerger's son, Reid, was trying to sell policies purchased on the secondary market with the Lapetus LE, less than a year ago.

d. "[Y]ou have to choose which accounting method you'll use for that policy and you can never change it." The implication is, contrary to Grant Thornton's conclusion, that Abacus has changed its accounting method for policies it has already purchased. But that is not the case: Abacus clearly discloses which policies it values by which method, and it has not switched the valuation of a policy once purchased.

e. "As you probably noticed, the amount of money they're investing each quarter and the amount their inventory grows each quarter is quite substantial. They need to do that in order by way of accounting and unrealized gains is the phrase they use in their 10-K and 10-Q." Buerger's suggestion is that Abacus is engaged in dishonest accounting, and that it ***only*** generates revenue through unrealized gains. Buerger fails to mention that Abacus is routinely audited and that Abacus sells hundreds of policies per quarter which results in realized gains.

f. "[R]ight now they've been trying to get the stock price up through their stock repurchase plan." This statement—made without any awareness of Abacus's internal decision making—suggests Abacus was somehow manipulating the market by implementing a routine stock repurchase.

g. "There's no public company that has survived as an ongoing entity that has focused entirely or almost entirely on life settlements. There's four or five that go back to the late 1997, 1998 and then there's been maybe three or four more since then, and all of them have gone bankrupt." Buerger is clearly implying that Abacus, the only publicly-traded life settlements company, will go bankrupt, notwithstanding the Company's record financial success in the year leading up to his interview.

h. "I should tell you also that Abacus has a $1 million investment in Lapetus Solutions, which was disclosed in correspondences with the SEC. The CEO of Abacus was on the board of Lapetus. In

industry publications, there are articles about this and once those articles came out, the CEO of Abacus immediately resigned from the Lapetus board." Read in context, Buerger made this statement to suggest Abacus unlawfully controlled Lapetus's independent, audited life expectancy calculations. This is patently false.

i. When asked whether Abacus holds its policies for more than "a short period of time," Buerger stated, "[n]otwithstanding that they do say that, it is just not accurate." His implication was that Abacus lied in its 2024 Annual Report, where it discussed the ongoing growth of its "hold" portfolio made possible by increased access to capital. Abacus 2024 Form 10-K at 7–8.

147. And perhaps one of Buerger's most brazen lies and statements to sow doubt about Abacus: "[I]t's just a matter of time before [Abacus] implode[s]."

148. Buerger knew these assertions were wrong, or at the very least, recklessly failed to apprise himself of the truth. Indeed, Buerger even conceded that the fair value approach Abacus actually uses to value its policies is the correct one: "[W]e"—referring to Coventry—"do a fair value calculation because ***I want to know what my policies are worth.***" The implication that Abacus does anything else is patently false, as anyone familiar with Abacus's disclosures would know.

149. While it is not yet known why Buerger was selected as a so-called industry "expert" on Abacus, it is clear that Buerger's sole purpose in giving the interview was to sow doubt about Abacus to industry leaders, experts, and investors, including Abacus's own investors. Indeed, Buerger knew or

should have known the content of his interview with Tegus would be published and broadcasted to all of Tegus's subscribers.

150. On June 4, 2025, at 8:00 a.m. ET, 90 minutes before the market opened, a transcript of the May 22 Tegus Interview was circulated to all of Tegus's subscribers. Indeed, on the evening of June 4, Mr. Jackson received an unsolicited email from a third party attaching the Tegus Interview transcript and informing Mr. Jackson that Buerger's interview about Abacus was "getting circulated" amongst key investors, including investors with large stakes in Abacus.

151. In addition, according to this third party, the Tegus Interview being circulated on June 4 appeared to be "very coordinated" with another hit piece published on June 4 that focused on amplifying Defendants' false and misleading statements about Abacus.

## V. MORPHEUS PUTS OUT THE SHORT REPORT BASED ON DEFENDANTS' LIES.

152. Three hours after institutional investors, including some with large positions in Abacus stock, received the Tegus Interview in their inboxes, Morpheus, a "research" group that appears to be a spin-off of the now-defunct Hindenburg Research group led by Nathan Anderson,[24] published the Short Report, a false, scathing and lengthy exposé purporting to reveal Abacus's

---

[24] *See* Nate Anderson (@NateHindenburg), X (Mar. 14, 2025, at 1:13 P.M. ET), https://tinyurl.com/dravzjzv ("This is a great team that I have known for a long time and includes some Hindenburg alumni.").

accounting fraud and "fake revenue" by undervaluing life expectancy estimates.[25]

153. While purporting to base the Short Report on "extensive research," the reality is that Buerger and Coventry have been working on this dossier since 2023, when Defendants first put Abacus in their crosshairs.

154. As early as January 2024, Buerger had previously shopped a hit piece to Morpheus's predecessor, Hindenburg Research, but Hindenburg passed.

155. Over the course of 2024, Buerger said he was reaching out to a number of other short sellers and former SEC whistleblowers, seeking a seemingly "independent" outlet to publish his defamatory statements.

156. Upon information and belief, Buerger and Coventry finally found a useful idiot in Morpheus. Morpheus is an LLC formed under the laws of the State of Delaware, with its authorized person being John H. Sutter, an attorney who represents short sellers seeking bounties from the federal government. In finding Morpheus, Defendants finally found a partner willing to amplify the lies that had failed to convince the markets for nearly two years.

---

[25] *See Abacus Global Management: This $740 Million SPAC Is Yet Another Life Settlements Accounting Scheme Manufacturing Fake Revenue By Systematically Underestimating When People Will Die*, Morpheus Research (June 4, 2025), https://www.morpheus-research.com/abacus/.

157. Accordingly, the Short Report parrots the same or similar false and misleading statements that Defendants had previously peddled. As Morpheus acknowledges, one of its "sources" for the Short Report includes "Abacus competitors," a.k.a. Coventry. In fact, the Short Report includes several direct quotes from Buerger.

158. Morpheus timed the Short Report perfectly to coincide with the release of the Tegus Interview. Although Morpheus uploaded supporting documents to a document sharing website on June 2, the Short Report was not released for another two days, when it would have maximum impact. Upon information and belief, Buerger informed Morpheus of his defamatory comments in the Tegus Interview, and Morpheus waited to publish its Short Report until Buerger's Tegus Interview had been shared with Tegus subscribers.

159. Like Coventry and Buerger, the Short Report attacks Abacus's purported relationship with Lapetus; falsely claims that Abacus uses Lapetus to value its balance sheet; and falsely claims that Abacus is overvalued. Specifically, the Short Report falsely repeats the following, playing all of Coventry's hits:

a. **The Short Report criticizes and aggrandizes Abacus's "relationship" with Lapetus**, saying the LE provider is an "intimately-linked" Abacus vendor;

b. **The Short Report implies Abacus is in violation of Florida Laws and Regulations:** "Abacus' initial hesitancy to fully disclose the Lapetus investment may have been due to Florida's prohibition against direct or indirect ownership of a life expectancy provider by a life settlements provider, due to the inherent conflict of interest it presents."

c. **The Short Report reprises Coventry's claims about Lapetus LE**, freely admitting that the claims that Lapetus has shorter life expectancy estimates come directly from the biased and flawed studies commissioned by Coventry.

d. **The Short Report falsely implies that Abacus uses Lapetus to value its balance sheet**. Morpheus directly quoted Buerger's public statement that Abacus's use of Lapetus means that "fair market value is grossly overstated." And by Morpheus's own words, Buerger's words "appear[] to have been aimed squarely at Abacus, which he seems to have likened to Mutual Benefits Corporation, an infamous life settlements fraud that claimed $250 million of investor capital in the early 2000s."

e. **The Short Report repeats Coventry's Claim that Abacus is overvalued due to counterfactual reliance on Lapetus:** Morpheus writes, "Abacus' Reliance On Lapetus Presents A Material Risk To The 'Unrealized Gains' Generated From Valuation Mark-Ups On Its Held Portfolio – Presenting An Estimated Writedown Risk Of At Least 35 - 50%." Morpheus also writes, "Abacus' reliance on Lapetus LE data to value its portfolio presents a material risk to its 'held' portfolio, which could be turned 'upside down' if the policies take longer to mature than anticipated." These statements similarly flow from Coventry. As highlighted above (*supra* ¶¶ 87–151), Coventry has publicly stated and privately told Abacus's stock valuator and auditor about Coventry's belief that Abacus is overvalued.[26]

[26] The Short Report included several other mischaracterizations, exaggerations and falsehoods regarding the prior associations and private lives of Abacus executives, each of whom continues to weigh appropriate legal action against Morpheus, Coventry, and any other potentially responsible party.

160. Notably, none of the market analysts familiar with Abacus, and whom Coventry was unable to persuade, bought the falsehoods in the Short Report. In an extraordinary series of third-party rebuttals, Bernstein Research called the Morpheus claims “misleading”; TD Securities stated that “ABL’s model . . . would seem to argue against overvaluation of policies”; and Piper Sandler called the reaction to the Short Report “overdone.”[27] These rapid reactions—*i.e.*, the truth—help explain why Coventry has had to be so underhanded in its effort to slow Abacus’s rise in the life settlements world.

161. Despite the claims in the Short Report, Abacus received strong support from market analysts that have paid close attention to the Company’s increasing success in recent years.

162. But many investors and traders are less familiar with Abacus, since Abacus does not have a regular media presence or a way to control the perception of its company in the public square. Those investors reacted negatively to the false and misleading statements contained in the Short Report, as well as Buerger’s comments in the Tegus Interview released on the same day.

163. Abacus’s stock dropped over 21% on June 4, 2025, causing the company to lose more than $157 million in market capitalization in a single

[27] *Abacus Refutes Misleading Balance Sheet Claims With Independent Third-Party Actuarial Valuation*, Abacus Global Management, Inc. (June 10, 2025), https://ir.abacusgm.com/news-releases/news-release-details/abacus-refutes-misleading-balance-sheet-claims-independent-third.

trading session. By June 27, Abacus's market capitalization had fallen some $287,400,000, for a total loss of roughly 39%.

## VI. DEFENDANTS' FALSE CLAIMS CAUSE ABACUS IMMEDIATE REPUTATIONAL AND FINANCIAL HARM.

164. After half a dozen attempts to find an effective attack on Abacus, it appears Coventry has finally dealt Abacus substantial reputational harm through the Tegus Interview and the Short Report.

165. Indeed, since Defendants' statements were published, dozens of shareholders have contacted Abacus about the false and misleading accusations. And, although the Morpheus report contains numerous claims that are not obvious repetitions of Defendants' other attacks, the incoming calls are only concerned with Lapetus and valuation issues, and specifically based on the premises that (i) Abacus uses Lapetus to value insurance policies; and (ii) valuations based on Lapetus LEs should be discounted.

166. In other words, it is the false claims by Buerger and Coventry, and nothing else in the Morpheus report, that has materially altered the market's view of Abacus as a company.

### A. Defendants' False Claims Taint Abacus In The Eyes Of Servicing Providers And Investors.

167. Abacus has lost client relationships as a result of the Short Report. For instance, one of its service providers, a consultancy that furnishes data on the populations from whom Abacus buys insurance policies,

broke off an agreement in principle with Abacus after seeing Defendants' falsehoods reprinted in the Short Report. This lost contract cost Abacus approximately $2.5 million in profits, as well as access to valuable information about nine million individuals, which Abacus could have used to strengthen its predictive models used for pricing and valuation.

168. Likewise, a distributor network from whom Abacus originates policies through broker and agent network paused its listing of Abacus as a life settlement provider for several weeks following the change in market perception.

169. Institutional investors have also paused or broken off their interest in Abacus funds. For example, the day before the Short Report issued, Abacus was in discussions with an intermediary representing a multi-trillion-dollar investment company to form a fund-of-one with a minimum duration of five years and a minimum investment of $100 million. Abacus Asset Group, a subsidiary of Abacus, would have managed the fund for a flat 1.5% annual management fee, and the fund's assets would be policies purchased in tertiary market transactions from Abacus Life Solutions (d/b/a Longevity Market Assets). The day after the Short Report issued, the investment company broke off the talks, causing Abacus to lose out on (i) at least $7.5 million in management fees; and (ii) at least $18 million in gain-on-

sale on the tertiary transactions, based on the Company's historical trade spreads.

170. Likewise, a credit union that was considering a fund-of-one investment in the range of $30–40 million has taken a wait-and-see approach since June 4, 2025, causing Abacus to lose out on at least $7 million in fees and gain-on-sale proceeds.

171. More generally, the Short Report has been widely discussed at recent investor conferences, and Abacus and its subsidiaries and affiliates are losing leads as a result.

172. For example, in the week after the Short Report, a portfolio manager at a major asset management firm told the head of Abacus investor relations that the company would "never recover" from the stock drop following the report.

173. Defendants' false and defamatory statements caused significant damages to Abacus's reputation and stock price and caused it to suffer financial harm by being forced to incur expenses to respond to the statements, including professional fees such as legal and accounting costs

Case 6:25-cv-01001-RBD-RMN Document 31-3 Filed 09/12/25 Page 62 of 81 PageID 1160

### B. Defendants' False Claims Harm Abacus's Most Recent Major Acquisition.

174. In 2024, Abacus purchased one hundred percent of Carlisle Management Company, an investor in the life settlement space that manages investment funds with policies underwritten in the tertiary market.

175. At Abacus's April 2025 Board meeting, Carlisle reported a pipeline of potential commitments to its ongoing fund raise. Those pipeline funds would have redounded to Abacus's benefit in at least four ways: (i) Carlisle's management fees 100% of which would have flown to Abacus; (ii) Carlisle's performance fees, 100% of which would have flown to Abacus; (iii) origination revenue, realized when Abacus sold policies to Carlisle; and (iii) servicing revenue, which Abacus would have realized as its subsidiary Longevity Market Assets would have continued to service any policy Abacus sold.

176. Following the release of the Short Report, Carlisle's pipeline has shrunk, and it has been as a direct result of investors questioning Carlisle's corporate parent (Abacus) and its practices.

177. For example, one large distributor, which had previously invested $100 million on behalf of its clients, in funds managed by Carlisle Asset Management (d/b/a/ Abacus Asset Group), asked Carlisle "[i]f policies valued using Lapetus and acquired from Abacus were marked down by 30%, what

would be the impact on aggregate NAV?" This distributor has not sent Carlisle a single lead since the publication of the Short Report.

**C. The Defamation And Accompanying Stock Drop Interrupt Abacus's Deal Flow.**

178. As Abacus grows, it always looks for potentially accretive strategic transactions to diversify its revenue streams and expand its reach into new, but complementary, markets and verticals.

179. To negotiate and close these types of transaction, Abacus relies on both its available balance sheet cash, borrowing capacity and its stock as forms of consideration. Deals that use stock as some or all of the consideration depend upon the company's reputation in public markets.

180. On the date of the Short Report, when Defendants' claims reached a wide audience, as they could have reasonably expected, Abacus had more than one deal in progress which was negotiated on the basis that Abacus stock would constitute the majority of the purchase consideration.

181. The publication of the Short Report, and the attendant drop in the price of Abacus stock, interrupted the progress of those transactions while Abacus management and their in-house and outside counsel were forced to respond to the falsehoods spread by Defendants and Abacus's M&A counterparties evaluated the fallout from the Short Report before returning to negotiations.

182. While Abacus continues to explore strategic M&A transactions using its stock as consideration, the delay has resulted in lost revenue opportunities entitling Abacus to compensatory damages in an amount to be proven at trial. Those lost opportunities are the direct result of Defendants poisoning the market.

## VII. COVENTRY AND BUERGER PUSH THEIR BIG LIE DIRECTLY TO ABACUS'S INVESTORS.

183. But reputational harm and lost opportunities are not enough for Coventry and Buerger. Since Defendants found an amplifier for their false and misleading statements aka when the Short Report was published, ***Buerger has been directly contacting Abacus's prospective and current investors that hold large positions***, recirculating the same misleading Coventry studies, and instructing them on what questions to ask Abacus to challenge Abacus's valuation practices.

184. Specifically, on June 17, 2025, Buerger sent the Coventry studies to the chief financial officer of an organization already holding a large position and which is interested in increasing its investments in Abacus life settlements. Buerger told the investor that the Coventry studies—which pertains to one of six LE providers Abacus uses, and which does not include any information about how Abacus values policies for investors—"will be . . . helpful with your diligence."

185. Again, Coventry's aim is to suggest that Abacus's use of an LE in the secondary market—which puts more money in the pocket of seniors selling their life insurance policies—is actually evidence of a widespread fraud.

## VIII. DEFENDANTS TIGHTEN THEIR STRANGLEHOLD ON THE INDUSTRY BY DRIVING LAPETUS OUT OF BUSINESS.

186. Over the 18 months that Defendants were disparaging and discounting Lapetus and Dr. Olshansky, the LE provider's business dwindled.

187. Controlling 50% of the life settlements business, and demonstrating a newfound animosity toward Lapetus LEs, Coventry was able to force brokers and tertiary market participants to seek LEs from one of the providers that had folded to its pressure.

188. Since the filing of the initial complaint, Defendants finally succeeded in destroying Lapetus and Dr. Olshansky's good name: On August 18, 2025, Lapetus announced that it would wind down and cease all operations. And, as of September 1, 2025, Lapetus did in fact cease all operations.

189. To be clear, Lapetus's financial ruin does not stem from its LE methodology, but rather, as Lapetus informed its investors, "in May of 2024, ***one of [Lapetus's] clients, Coventry***, began a major campaign to tarnish

our reputation in the [life settlement] industry ***after we refused to fraudulently adjust our LEs for [Coventry's] financial benefit***." (emphasis added).

190. Lapetus also issued a public statement, cited in Defendants' motion to dismiss (although not attached as an exhibit), noting one reason it had been forced to close was its integrity, referencing the pressure put on by Buerger and Coventry: "Lapetus did face pressure from some clients to raise or lower our LEs for certain cases or even entire books of lives. While we have agreed to reassess a case if it is documented that we missed something in the medical records, Lapetus never acquiesced to pressure to change our LEs to favor anyone."

191. With Lapetus no longer providing LEs, the Fund amended its N-2 to reflect the fact that Coventry forced Lapetus to shut down its operations. Now the Fund expects to rely on the LE provider that has produced the most current life expectancy report with respect to a given Mortality Contract." ABL Longevity Growth & Income Fund, Preliminary Prospectus (Form N-2) at 46 (Aug. 15, 2025).

* * *

192. Abacus now seeks compensation for the great harm done to its reputation and the specific damages it has suffered as a result of Defendants'

Case 6:24-mc-00004-RBD-RMN Document 38 Filed 12/11/25 Page 67 of 81 PageID 165

campaign of falsehoods. This harm is ongoing, because Defendants' campaign to ruin Abacus is ongoing.

## COUNT I
## (Defamation against all Defendants)

193. Abacus realleges and incorporates Paragraphs 1 through 192 as if fully set forth herein. Abacus further alleges:

194. Abacus is not a public figure or a limited public figure.

195. Coventry and Buerger are non-media defendants.

196. Coventry and Buerger do not publish disinterested and neutral commentary or editorializing as to matters of public interest.

197. Coventry and Buerger published false and misleading statements intended to damage Abacus's reputation and business.

198. Coventry and Buerger published multiple malicious and defamatory statements disparaging Abacus's business integrity and accusing Abacus of securities law violations as well as improperly inflating its enterprise valuation.

199. Coventry's and Buerger's statements about Abacus are false, including but not limited to:

a. "***If you're a public company***, you're trying to generate steady progress in your quarterly earnings like any public company. ***The temptation that creates is to manufacture earnings***, which with a Level three asset is an easy temptation to fulfill. Specifically . . . Abacus uses Lapetus as their so-called

independent medical underwriting company, ***not exclusively but primarily***."

b. "The problem with that is the stockholders, the baby bondholders, and even the [Sagard] loan ***will be subordinated to the asset-backed debt***, which is to say they will all be wiped out when this thing goes upside down."

c. "[O]ther than very small, unsophisticated, frankly stupid investors, nobody's using Lapetus anymore."

d. "[Y]ou have to choose which accounting method you'll use for that policy and you can never change it."

e. "[I]t's just a matter of time before [Abacus] implode[s]."

f. Abacus's "fair market value is grossly overstated," and the "$250 million dollars out there that investors have put up" with Abacus "is dead."

g. Lapetus's life expectancy estimates are "consistently and materially shorter than those issued by other life expectancy providers, potentially leading to the overvaluation of life insurance policies and investor losses."

h. Coventry's own "internal review" "results cast doubt on the accuracy of asset valuations based primarily on Lapetus life expectancies."

i. "[V]aluations based on Lapetus life expectancies could lead to significantly inflated asset values and investor losses."

j. When asked whether Abacus holds its policies for more than "a short period of time," Buerger stated, "***[n]otwithstanding that they do say that, it is just not accurate***."

200. Coventry's and Buerger's false and defamatory statements exposed Abacus to contempt and injury to its business reputation. While Abacus continues to assess the harm sustained as of the date of the filing of this complaint, at a minimum Abacus has been harmed, including as follows:

a. Abacus has sustained a loss of market capitalization;

b. Abacus lost out on 1.5% management fees in connection with a $100 million private fund deal over the course of five years;

c. Abacus and its direct subsidiaries have lost several prospective customers, representing investible funds in an amount to be proven at trial;

d. Abacus has lost several current customers;

e. Abacus has lost a contract for the provision of mortality data worth approximately $1.1 million per year for five years, totaling $5.5 million, the profits of which would have been $2.5 million or more, and which would have given the company valuable data on approximately nine million individuals; and

f. Due to the drop in stock price caused by the Defendants, Abacus has suffered damages in an amount to be proven at trial flowing from the interruption to the company's deal flow.

201. Coventry and Buerger published these false and defamatory statements about Abacus to numerous third parties on the internet through email, blog posts, and at industry events such as the LISA Life Settlement Conference in Miami, Florida in October 2024.

202. Coventry and Buerger knew the false and defamatory statements about Abacus were false when made and/or acted with reckless disregard to the truth of the statements.

203. Coventry's and Buerger's false and defamatory statements do not enjoy any absolute or qualified privilege.

204. Coventry and Buerger published these false and defamatory statements about Abacus willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Abacus.

205. Coventry's and Buerger's false and defamatory statements have adversely affected Abacus's otherwise good business reputation, including with regard to Carlisle's fundraising efforts.

206. Convetry's and Buerger's statements were published with express malice, primarily motivated by an intent to injure Abacus, as demonstrated without limitation in Paragraph 91.

207. As a direct and proximate result of Coventry's and Buerger's actions, Abacus suffered substantial damages, including reputational injury and financial harm, in an amount to be proven at trial.

**<u>COUNT II</u>**
**(Defamation by Implication against all Defendants)**

208. Abacus realleges and incorporates Paragraphs 1 through 192 as if fully set forth herein. Abacus further alleges:

209. Abacus is not a public figure or a limited public figure.

210. Coventry and Buerger are non-media defendants.

211. Coventry and Buerger do not publish disinterested and neutral commentary or editorializing as to matters of public interest.

212. Coventry and Buerger published false and misleading statements intended to damage Abacus's reputation and business.

213. Coventry and Buerger created a defamatory implication about Abacus by falsely comparing Abacus to past life settlements companies that failed, implying Abacus violated various state and federal laws, and suggesting Abacus improperly inflated its enterprise valuation. Coventry and Buerger did so by juxtaposing and/or omitting facts with the intention of creating a defamatory implication.

214. Coventry and Buerger created a defamatory implication about Abacus using intentionally misleading statements, including but are not limited to:

a. "[Abacus's] fair market value is grossly overstated," and the "$250 million dollars out there that investors have put up . . . is dead. . . . I worry that it's going to be $300, $400, $600, and $1 billion. With Mutual Benefits, it was $800 million. . . . It's going to be awful for us."

b. "The unique relationship includes Abacus having held a seat on LAPETUS' board of directors through Abacus CEO Jay Jackson, and Abacus affiliates investing heavily in LAPETUS. . . . Both of these relationships may violate the Life Expectancy reform law passed by the legislature in the wake of the Mutual Benefits collapse. ***Because Mutual Benefits exerted pressure on its life expectancy providers, whom it could control because of their relationships***, the legislature now requires independence between settlement providers and Life Expectancy providers. . . . ***The relationship between Lapetus and Abacus is so close*** that an Abacus company has, despite the overwhelming evidence that Lapetus issues by far the shortest Life Expectancies in the

market, bizarrely asserted that 'Lapetus Solutions provides the most conservative (i.e., the longest) life expectancy predictions.'"

c. "There's no public company that has survived as an ongoing entity that has focused entirely or almost entirely on life settlements. There's four or five that go back to the late 1997, 1998 and then there's been maybe three or four more since then, and ***all of them have gone bankrupt***."

d. "[W]e"—referring to Coventry—"do a fair value calculation because I want to know what my policies are worth."

e. "As you probably noticed, the amount of money they're investing each quarter and the amount their inventory grows each quarter is quite substantial. They need to do that in order by way of accounting and unrealized gains is the phrase they use in their 10-K and 10-Q."

f. "[R]ight now they've been trying to get the stock price up through their stock repurchase plan."

215. Upon information and belief, Defendants have made other defamatory implications about Abacus that will be revealed through discovery in this action.

216. Coventry's and Buerger's defamatory implications exposed Abacus to contempt and injury to its business reputation. While Abacus continues to assess the harm sustained as of the date of the filing of this complaint, at a minimum Abacus has been harmed, including as follows:

a. Abacus has sustained a loss of market capitalization;

b. Abacus lost out on 1.5% management fees in connection with a $100 million private fund deal over the course of five years;

c. Abacus and its direct subsidiaries have lost several prospective investors, representing investible funds in an amount to be proven at trial;

d. Abacus has lost several current customers;

e. Abacus has lost a contract for the provision of mortality data worth approximately $1.1 million per year for five years, totaling $5.5 million, the profits of which would have been $2.5 million or more, and which would have given the company valuable data on approximately nine million individuals; and

f. Due to the drop in stock price caused by the Defendants, Abacus has suffered damages in an amount to be proven at trial flowing from the interruption to the company's deal flow.

217. Coventry and Buerger published these defamatory implications about Abacus to numerous third parties on the internet through email, blog posts, and at industry events such as the LISA Life Settlement Conference in Miami, Florida in October 2024.

218. Coventry and Buerger knew the false and implications statements about Abacus were false when made and/or acted with reckless disregard to the truth of the statements.

219. Coventry's and Buerger's false and defamatory implications do not enjoy any absolute or qualified privilege.

220. Coventry and Buerger published these false and defamatory implications about Abacus willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Abacus.

221. Coventry's and Buerger's statements were published with express malice, primarily motivated by an intent to injure Abacus, as demonstrated without limitation in Paragraph 91

222. Coventry's and Buerger's false and defamatory implications have adversely affected Abacus's otherwise good business reputation, including with regard to Carlisle's fundraising efforts.

223. As a direct and proximate result of Coventry's and Buerger's actions, Abacus suffered substantial damages, including reputational injury and financial harm, in an amount to be proven at trial.

**COUNT III**
**(Defamation *Per Se* against all Defendants)**

224. Abacus realleges and incorporates Paragraphs 1 through 192 as if fully set forth herein. Abacus further alleges:

225. Abacus is not a public figure or a limited public figure.

226. Coventry and Buerger are non-media defendants.

227. Coventry and Buerger do not publish disinterested and neutral commentary or editorializing as to matters of public interest.

228. Coventry and Buerger published false and misleading statements intended to damage Abacus's reputation and business.

229. Coventry and Buerger published multiple malicious and defamatory statements disparaging Abacus's business integrity and accusing Abacus of securities law violations as well as improperly inflating its enterprise valuation.

230. Coventry's and Buerger's statements about Abacus are false, including but not limited to the statements listed in Paragraphs 199 and 214.

231. Coventry's and Buerger's false and defamatory statements exposed Abacus to contempt and injury to its business reputation.

232. Coventry's and Buerger's false statements are defamatory *per se* because, when considered alone without innuendo, these statements subject Abacus to distrust, contempt, or disgrace and/or injure Abacus in its trade or profession by accusing Abacus of securities law violations as well improperly inflating its enterprise valuation.

233. Coventry and Buerger published these false and defamatory statements about Abacus to numerous third parties on the internet through email, blog posts, and at industry events such as the LISA Life Settlement Conference in Miami, Florida in October 2024.

234. Coventry and Buerger knew the false and defamatory statements about Abacus were false when made and/or acted with reckless disregard to the truth of the statements.

235. Coventry's and Buerger's false and defamatory statements do not enjoy any absolute or qualified privilege.

236. Coventry and Buerger published these false and defamatory statements about Abacus willfully and with malice, specifically with the purpose, desire, and effect of causing injury to Abacus.

237. Coventry's and Buerger's false and defamatory statements have adversely affected Abacus's otherwise good business reputation, including with regard to Carlisle's fundraising efforts.

238. As a direct and proximate result of Coventry's and Buerger's actions, Abacus suffered substantial damages, including reputational injury and financial harm, in an amount to be proven at trial.

**COUNT IV**
**(Deceptive and Unfair Trade Practices, Fla. Stat. § 501.204, against all Defendants)**

239. Abacus realleges and incorporates Paragraphs 1 through 192 as if fully set forth herein. Abacus further alleges:

240. At all relevant times, Coventry and Buerger were engaged in trade or commerce as defined in section 501.203(8) of the Florida Statutes.

241. Coventry and Buerger violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") by engaging in a deceptive and unfair smear campaign to damage Abacus's share price, reputation in the marketplace, and business relationships, as set forth above (*supra* ¶¶ 87–151), for Coventry's and Buerger's perceived gain.

242. Coventry and Buerger further violated FDUTPA in its statements directed at Lapetus, including, *inter alia*, claiming that Lapetus LEs posed an "existential threat" to the life settlements business. These

statements were substantially the cause of Lapetus going out of business in August of 2025.

243. The Defendants' attacks on Lapetus misconstrued data, misrepresented facts, and misled Lapetus's customers, one of which was Abacus. The attacks were untrue, and thus their dissemination was immoral, unethical, oppressive, and unscrupulous.

244. Coventry's and Buerger's deceptive and unfair trade practices have caused Abacus actual harm, including but not limited to by causing Abacus's share price to drop, causing Abacus to lose revenue and profits, and causing Abacus to suffer other commercial injuries. Coventry's and Buerger's deceptive and unfair trade practices have also harmed consumers by misleading investors and artificially consolidating market share in Coventry.

245. Coventry and Buerger's deceptive and unfair trade practices have also harmed Abacus as a customer for LEs as it incurs professional fees and switching costs to recoup the unique medical underwriting information that it was only able to obtain from Lapetus, in an amount to be proven at trial.

**COUNT V**
**(Tortious Interference with Business Relations against Buerger)**

246. Abacus realleges and incorporates Paragraphs 1 through 192 as if fully set forth herein. Abacus further alleges:

247. Abacus has business relationships with several large investors, including the large credit union referenced in Paragraph 170.

248. Buerger spoke to the CFO of the credit union specifically because Buerger was aware the credit union was invested with Abacus.

249. Buerger intentionally and unjustifiably encouraged the credit union CFO to question and distrust Abacus's valuation marks through his use of the Coventry studies.

250. As a result, the CFO took a wait-and-see approach since June 4, 2025, on a fund-of-one investment in the range of $30–40 million, causing Abacus to lose out on at least $7 million in fees and gain-on-sale proceeds. This was a breach in a business relationship.

251. Buerger's activities, and those like it with other customers, have caused Abacus reputational harm.

252. The Defendants' misconduct, as alleged herein, was grossly negligent in that it was so reckless or wanting in care that it constituted a conscious disregard of Abacus's rights. Alternatively, Defendants' misconduct, as alleged herein, was intentional such that they had actual knowledge of the wrongfulness of the conduct and of the high probability that injury or damage would result to Abacus and, despite that knowledge, intentionally pursued their course of conduct.

## RELIEF

WHEREFORE, Abacus demands judgment against Defendants and requests relief as follows:

a. Compensatory damages in an amount to be proven at trial, including but not limited to for redress of reputational harms;

b. An award of punitive damages;

c. A judicial declaration that the statements listed in Paragraphs 199 and 214 are defamatory;

d. An order requiring Defendants to retract all previously published defamatory statements;

e. Attorneys' fees and costs;

f. Pre- and post-judgment interest, to the maximum extent provided by law; and

g. Any and all other legal or equitable relief to which Abacus is entitled.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Abacus respectfully demands a trial by jury on all issues so triable.

DATED: September 18, 2025

*/s/ Jason Sternberg*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Alex Zuckerman (*pro hac vice*)
alexzuckerman@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
(212) 849-7000

Jason D. Sternberg (Fla. Bar No. 72887)
jasonsternberg@quinnemanuel.com
David M. Walsh (Fla. Bar No. 1048823)
davidwalsh@quinnemanuel.com
2601 South Bayshore Drive, 15th Floor
Miami, FL 33133
(305) 402-4880

Kathleen S. Messinger (*pro hac vice*)
kathleenmessinger@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

*Attorneys for Plaintiff Abacus Global Management, Inc.*